**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|                         |     |                            |
|-------------------------|-----|----------------------------|
|                         | )   |                            |
|                         | )   |                            |
| JOHN P. MALLOY,         | )   |                            |
|                         | )   |                            |
|                         | )   | CIVIL ACTION NO. 06-1714   |
|     Plaintiff,          | )   |                            |
|                         | )   |                            |
|                         | )   |                            |
|     v.                  | )   |                            |
|                         | )   |                            |
|                         | )   |                            |
| MICHAEL J. ASTRUE,      | )   | JUDGE JOY FLOWERS CONTI    |
| Commissioner of Social  | )   | MAGISTRATE JUDGE CAIAZZA   |
| Security,               | )   |                            |
|                         | )   |                            |
|                         | )   |                            |
|     Defendant.          | )   |                            |
|                         | )   |                            |

**REPORT AND RECOMMENDATION**

**I. RECOMMENDATION**

Acting pursuant to 42 U.S.C. § 405(g), John P. Malloy
("Malloy" or "the claimant"), appeals from a November 3, 2006
decision of the Commissioner denying his application for
Supplemental Security Income benefits. Cross Motions for Summary
Judgment (Docs. 8 and 10) are pending. It is respectfully
recommended that these Motions be denied. It is further
recommended that the decision of the Commissioner be reversed and
this matter remanded for a new hearing.

**II. REPORT**

**A. PROCEDURAL BACKGROUND**

On April 29, 2005 Malloy filed an application for

Supplemental Security Income benefits, alleging that as of that date he was disabled within the meaning of the Social Security Act ("the Act"). Malloy's application was denied initially on December 6, 2005, and Malloy requested a hearing. The hearing took place on September 6, 2006 before an administrative law judge ("ALJ") in Latrobe, Pennsylvania. Malloy, who was represented by counsel, and a vocational expert testified.

On September 13, 2006, the ALJ issued an opinion in which he concluded that Malloy was not disabled for purposes of the Act, and was not, therefore, entitled to Supplemental Security Income benefits. The Appeals Council denied Malloy's request for review on November 3, 2006, making the ALJ's September 2006 decision the final decision of the Commissioner. This timely appeal followed.

## B. THE ALJ'S OPINION

The ALJ arrived at his finding that Malloy was not disabled for purposes of the Act by applying the sequential five step analysis articulated at 20 C.F.R. §§ 404.1520(a) and 416.9020(a),[1]

---

[1] The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, she is not disabled; (2) If the claimant is not performing substantial gainful work, her impairment(s) must be "severe" before she can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent her from doing her past relevant work, she is not disabled; (5) Even if the claimant's impairment or impairments prevent her from performing her past work, if other work exists in

resolving this matter at Step Five.

The ALJ found that Malloy, a fifty year old widower with a seventh grade education, had a number of severe impairments including degenerative disc disease of the lumbar and thoracic regions, history of a T12 fracture, dextroscoliosis, history of recurrent pericarditis, hypertension, hyperlipidemia, a major depressive disorder, a general anxiety disorder, a personality disorder, a history of polysusbstance abuse, and a history of adjustment disorder. (R. 14). None of these impairments, alone or in combination, was found to constitute a listed impairment. (R. 15).

The ALJ next determined that Malloy had the residual functional capacity to perform a light range of work subject to certain postural and other limitations. In making the finding, the ALJ stated that he had considered all of Malloy's alleged symptoms in light of the objective medical evidence and the other evidence, and had evaluated the opinion evidence with reference to the applicable regulations and rules. Based on this evidence, the ALJ concluded that Malloy's medically determinable impairments could reasonably be expected to produce the symptoms alleged, but that the claimant's statements regarding the intensity, persistence, and limitations associated with the symptoms were only partially

---

significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

credible. (R.15).

The ALJ concluded that Malloy could not return to his past work as a roofer, but was, based on questions posed to the vocational expert, capable of performing a range of light work subject to postural and other limitations. He also concluded that jobs accommodating Malloy's residual functional capacity were available in significant numbers in the national and local economies. As a result, the ALJ found that Malloy was not disabled.

### C. STANDARD OF REVIEW

The Act limits judicial review of the Commissioner's final decision regarding benefits to whether the factual findings are supported by substantial evidence, Brown v. Brown , 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the correct law was applied. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984).

### D. ALLEGED ERRORS IN THE ALJ'S EVALUATION OF THE EVIDENCE

The claimant argues that the findings of the ALJ are not supported by substantial evidence, are not based on proper legal standards, and "are products of an analytical process that failed to fully and fairly analyze the evidence." (Doc. 9 at 8). Specifically, Malloy contends: "[T]he ALJ . . . mischaracterizes the record in an effort to discount the severity of [the claimant's] symptoms." (Doc. 9 at 10).

4

The court has undertaken a thorough analysis of the record, and finds that the claimant's arguments have merit. Specifically, the court is troubled by the ALJ's evaluation of Malloy's credibility, and by his treatment of the evidence cited in support of Malloy's residual functional capacity. These issues are intertwined in the ALJ's opinion, and the court will not attempt to separate them in its review of the evidence.

The ALJ did not discuss Malloy's subjective complaints of physical pain, instead limiting his focus to Malloy's statements regarding the extent and severity of his mental impairments, concluding that they were "not entirely credible. " This finding was central to his ultimate determination that Malloy was not disabled. In support of this credibility assessment,the ALJ relied first on treatment notes prepared by Dr. Hirsch, summarizing them as follows: "[T]he physical examination was unremarkable, and Dr. Hirsch concluded the claimant would be capable of employment with a behavioral adjustment." (R.15). The ALJ did not reveal, however, that Dr. Hirsch's full report paints a very different picture. Dr. Hirsch diagnosed Malloy as having a personality disorder with paranoid tendencies, and remarked that the condition was "probably disabling." (R. 176). He wrote, "I do feel at this time that he is disabled, but not for his somatic complaints . . . but rather for his obvious emotional instability that ranges from depression to paranoia." Id. Later in the report, Dr. Hirsch commented on Malloy's ability to work:

> I think this individual is probably not
> capable of employment at this time. He
> could be made capable of employment if
> he could get his behavior problem
> adjusted. I am strongly advising him to
> look at a temporary Medicaid Disability.
> I would gladly attest to that providing
> he would follow-up [sic] with acceptance
> of referral to behavioral management . . . .

(R. 177).

The ALJ next discussed Dr. Sahalaney's X-Ray report which
reflected that Malloy suffered from a compression fracture of the
T12 vertebral body, moderate to severe degenerative disc disease
of the thoracic spine, and mild to moderate degenerative disease
at L1-2. The ALJ also noted that Malloy received treatment for his
back in the emergency room on August 30, 2005. According to the
ALJ, Malloy "complain[ed] of back pain and there was tenderness
noted in the mid to lower central lumbar area, but the
neurological exam was intact." (R. 188). The ALJ's summary of the
emergency room visit omits the fact that the doctors credited his
complaints of severe pain, administering Toradol and giving Malloy
a prescription for the narcotic, Percocet.

The ALJ next recounted the findings of Malloy's primary care
physician, Dr. Han, citing them to cast doubt on Malloy's
credibility, and on the actual severity of his impairments. Again,
the court has reviewed these notes with utmost care, and is
convinced that the ALJ's synopsis of Dr. Han's findings ignores
information that supports the veracity of the claimant's
allegations.

6

Malloy's first visit with Dr. Han took place on September 9, 2005. The ALJ failed to mention that Dr. Han spent "a long time discussing pain control" with the claimant. Malloy had tried to use Vicodin, but found Percocet more effective. Malloy reported anxiety. (R. 204-205). The ALJ also failed to note that at the November 8, 2005 visit with Han, Malloy complained of low back pain, depression, and anxiety. He was given an Effexor starter kit and a ninety day supply of Percocet. (R. 206). On December 12 2005, Dr. Han noted that Malloy had been diagnosed with anxiety, paranoia, depression, and a pain disorder of the lower back. (R. 260). The back pain was described as being on both sides, radiating down both legs. Standing too long aggravated this pain. Lying down or sitting too long also made the pain worse. Percocet helped. He suffered from paravertebral and thoracic spasms. His supine straight leg test was mildly positive. Dr. Han wrote that Malloy's back pain was controlled, but that he would require long term pain management.(R. 266). None of this information is mentioned in the ALJ's opinion.

On January 31, 2006 an MRI of Malloy's thoracic spine revealed mild bulging of the annulus fibrosis of L3 and L4. The were no abnormalities in the marrow.

In July 2006, Dr. Han completed an employability re-assessment form on behalf of Malloy, in which he concluded that Malloy was permanently disabled due to anxiety, depression, hypertension, possible bi-polar disorder, and low back pain. He

7

wrote that this assessment was based on physical examinations, a psychiatric evaluation done by Dr. Dongiovanni, a review of medical records, a clinical history, and appropriate tests and diagnostic procedures. The ALJ discounted the import of this conclusion, noting that it was prepared in order to establish Malloy's eligibility for state welfare benefits. "The rules and standards applied by the State of Pennsylvania are different than the standards set forth in the Social Security Act and its regulations." (R. 16)[2]. The ALJ also stated that the disability form did not contain an analysis supporting its conclusions, was not consistent with Dr. Han's treatment notes, and contradicted the balance of the medical evidence. Id.

In August 2006, Dr. Han completed a physician's report, apparently at the request of Malloy's attorney. (R. 281). He wrote that Malloy had a long history of low back pain and anxiety, and was taking pain, anti-depressant, and anti-anxiety medication. The ALJ did not discuss these findings, but included in his opinion a

---

[2]It is not clear whether the ALJ considered this piece of evidence in light of the standards set out in SSR 06-03p. This ruling, which addresses, among other things, the role of evidence supporting disability decisions made by other governmental or non-governmental agencies, clarifies that decisions made by other agencies are not binding on the Commissioner. It recognizes, however, that "[t]hese decisions and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules." Opinion evidence from medical sources who have had contact with the claimant in their professional capacities is to be evaluated. "We are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and non-governmental agencies. 20 C.F.R. 04.1512(b)(5) and 416.912(b)(5)."

quotation attributed to Dr. Han. According to the ALJ, Han stated that Malloy's back pain was controlled with Percocet "and his mental health problems are relatively stable and getting better with regular follow-up and social support." Id. In fact, Han's actual words were substantially less optimistic. He described Malloy's situation as "clinically relatively stable; the back getting better but the anxiety and depression similar." (R. 282). Malloy needed to be followed monthly for medical and social support. Id. When asked whether Malloy could engage in employment on a regular sustained competitive and productive basis, the doctor answered: "Probably not because patient could not maintain his job before because of anxiety, depression and lower back pain." (R. 283). This information was omitted from the ALJ's summary of the evidence.

In the "physical capacities" portion of the form, Dr. Han wrote that Malloy could sit, stand, walk, and drive for one hour each in every eight hour work day. He could occasionally lift ten pounds, but never more. He could not perform simple grasping or fine manipulations with either hand, and could not engage is pushing or pulling.[3] Repetitive foot movements were also precluded. He could perform postural maneuvers occasionally, and

---

[3] In October 2000, Malloy was diagnosed with "left radial wrist drop, radial nerve neuropraxia", and was given prednisone. (R. 129). In August 2006, Dr. Han noted that Malloy had complained of sensory loss in three fingers of his left hand. (R. 286). Malloy testified about this numbness at the hearing, stating that it had caused him to burn his hand on a light bulb. (R. 323-24).

was not limited in his ability to work at unprotected heights, around moving machinery, or in extremes of temperature and humidity. He did not need to avoid exposure to dust, fumes, and gasses.(R. 284). He was mildly limited in his ability to drive automotive equipment. <u>Id.</u>

Dr. Han described Malloy's back pain as moderate, and listed the following objective signs documenting his conclusions: X-rays, joint deformity, muscle spasm, and spinal deformity. Han stated that Malloy would require frequent rest breaks and would probably miss work frequently due to exacerbation of pain. (R. 285). The ALJ rejected these conclusions, finding that they did not comport with the remainder of the medical evidence, and, more importantly, were compromised by Malloy's presence at the time the form was completed. The ALJ wrote:

> Dr. Han's medical source statement cryptically ends with a note that reflects that the claimant was apparently standing over him when he filled out the conclusions related to work capacity (Exhibit 17F). In the absence of any treatment-related justification for the inclusion of such an entry, it appears that Dr. Han was indicating that the conclusions were largely, if not completely, based on the claimant's subjective complaints.

<u>Id.</u>

The "cryptic note" to which the ALJ refers actually appears at the conclusion of Exhibit 20F, and reads: "These forms were filled up [sic] with patient together when [he was] examined at the office." (R. 285). The court does not see how, from this

single sentence, the ALJ was able to conclude that the claimant was "leaning over" Dr. Han, that he dictated how Dr. Han should fill in the blanks, or that Dr. Han had no real input. This is especially true where the symptoms and limitations noted - particularly those involving back pain - are consistent with the symptoms and effects to which Malloy consistently attested over a sustained period of time, and are documented, in the main, elsewhere in Dr. Han's treatment notes.

In support of his conclusion that Malloy's subjective statements about his impairments and the associated limitations were not fully credible, the ALJ next discussed Malloy's August 2005 hospitalization records. The ALJ recognized that the claimant was hospitalized through Latrobe Area Hospital Mental Health Center because he felt anxious, feared being around people, and suffered from daily depression. The ALJ apparently concluded, however, that Malloy was insincere in describing the extent of his symptoms since "progress notes . . . indicated [that he] participated in group discussions." (R. 19). Later in his opinion, the ALJ faults Malloy for "not following through with treatment" at the Center. (R. 17). It is difficult to understand how action and inaction can simultaneously be invoked as grounds for impugning Malloy's credibility.

Finally, the court is confused by the ALJ's finding that Malloy's allegations regarding the severity of his impairments were inconsistent with his "wide array of daily activities." (R.

18) The ALJ wrote:

> The claimant testified he recently
> attempted to put up paneling in his
> bathroom, recently carried an extra
> automobile battery from his porch
> and performed [other] activities
> including simple meals, washing
> laundry, sweeping and cleaning his
> home. Further, he recently obtained
> his driver's license and needed to
> repair a truck to start driving
> again. Additionally, the claimant
> was responsive and coherent during
> testimony . . . .

Id.

A close reading of Malloy's hearing testimony establishes that the array of activities that he was able to perform was not as wide as the ALJ suggests. For example, The ALJ asked Malloy to provide an example of something that he had given up doing because of his impairments. Malloy answered that it had once been easy for him to put up paneling, but when he tried to put a sheet in his bathroom, he had trouble measuring and deciding where to put the hole for an electrical outlet. (R. 307). He had to abandon the project. Id. In addition, it is difficult to see how Malloy's "need to fix his truck" qualifies as an activity. Malloy testified at his hearing that the truck ran fine, but that he could not afford to license or insure it. (R. 326-27).

Malloy also testified that beyond making a sandwich or a bowl of cereal he did not cook. He could not pay for cooking gas, so his mother and sister cooked for him. (R. 315). He was capable of washing clothes at his mother's, and could run the sweeper at his

12

house, although " he tend[ed] to let it go too far." (R. 317). He
did not do dishes because his water service had been terminated.
"It's strictly Styrofoam." (R. 318). He could not grocery shop,
and relied on his sister or a friend. He could occasionally go
quickly to get a pack of cigarettes when there was no one else in
line. He watched television, but did not read or have hobbies. He
never had visitors, did not belong to clubs, and did not attend
church. Id.  There was no public transportation in his area. He
did not eat in restaurants. He could empty his own trash and had
to burn it because he could not afford trash collection. (R. 321).
When asked how much he could lift, he responded that he had lifted
a car battery recently, but it "hurt like hell." (R. 326).

    The ALJ also supported his residual functional capacity
determination by discussing "a psychiatric evaluation performed by
Dr. Charles J. Franchino on January 26, 2006." (R. 17). According
to the ALJ, Dr. Franchino did not indicate that Malloy suffered
from a serious mental impairment. The opinion contains the
following synopsis of Dr. Franchino's findings:

>           [T]he claimant was casually attired and
>           generally well-kempt. His mood was
>           depressed, but affect was appropriate,
>           thought process was coherent and
>           associations were goal directed. Speech
>           was normal, paranoia was denied and he
>           was oriented to time, place, and person.
>           Memory and recall were diminished and
>           judgment and insight were limited but
>           language, comprehension, attention and
>           concentration were intact. Further, the
>           claimant was not consistent with follow-
>           up treatment, he realized some benefit

> with Seroquel and mental status
> examinations were not significantly
> limited.

(R.19).[4] This summary glosses over information in the examination
report that the court finds important. Malloy reported that he had
difficulty sleeping, and that his mood was deteriorating. He felt
depressed, angry, and paranoid when in public. He avoided going to
the store during the day, preferring to go out at night when he
felt more anonymous. He had tried a variety of antidepressants
including Zoloft, Paxil, Prozac, Lexapro, Trazadone, and several
others whose names he could not remember. (R. 233).

More significantly, however, the ALJ did not mention that Dr.
Franchino assigned Malloy a GAF of 50, and found that this was the
highest GAF that the claimant had achieved in the prior year. "A
GAF score of 40 -50 denotes 'serious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) OR a
serious impairment in social, occupational, or school functioning
(e.g., no friends, unable to keep a job). American Psychiatric
Association, Diagnostic and Statistical Manual of Mental Disorders
32 (4th ed. 2000).' [G]AFs from 45-50 indicate that the person
cannot perform competitive work on a sustained basis

---

[4]The record does show that Malloy missed four appointments over the
course of his treatment with Dr. Franchino. Although the court cannot be
sure, it presumes that the ALJ's observation regarding these
appointments was included because of its bearing on Malloy's credibility
or on the severity of his mental impairments. In light of Malloy's
statements that public transportation was not available, and that he did
not have access to a car, it is difficult to view these missed
appointments as particularly probative on either issue.

. . . . ” Schweighauser v. Barnhart, No. 06-1397, 2006 WL 33544448

at *2 (E.D. Pa. 2006).

The ALJ's opinion also fails to indicate that Dr. Franchino

did not examine Malloy on one occasion. He was, in fact, Malloy's

treating psychiatrist, and saw him on multiple occasions  - none

of which is mentioned by the ALJ. This omission is particularly

disturbing given the content of Dr. Franchino's treatment notes.

On February 23, 2006, Dr. Franchino saw Malloy, assigning him a

GAF of 40. He described the claimant has having a good appearance,

a full range of appropriate affect, normal speech, and a coherent

and goal-directed thought process. The doctor, however, reported

that Malloy was not leaving his house due to depression, had a low

tolerance for frustration, and exhibited cognitive abnormalities

in insight, intellect, and memory. (R. 230).

On March 22, 2006, Dr. Franchino set Malloy's GAF at 50,

noting abnormalities in insight and executive functioning. The

claimant was referred for a neurology consultation.(R. 227).

About ten days later, Dr. Franchino assigned Malloy a GAF of

40, and observed that Malloy's anxiety level, ability to sleep,

appetite, energy, motivation, socialization, and interest had all

worsened since his last visit. His insight was abnormal, and -

though they are nearly illegible - the notes appear to indicate

that he was experiencing delusions. (R. 279). Dr. Franchino

reiterated the need for a neurological consultation.

Notes in Malloy's file made June 12 and 13, 2006 indicated

15

that Malloy called Dr. Franchino to let him know that he was having a difficult time locating a neurologist. (R. 278). He thought that he had found a doctor in Johnstown, but could not be seen until August.

On June 15, 2006, Dr. Franchino examined Malloy, assigned him a GAF of 50, and wrote that the claimant was experiencing auditory hallucinations, hearing mumbling voices (R. 277). Malloy still had not located a neurologist willing to accept his insurance. Notes in Dr. Franchino's file reflect that Malloy called the doctor's office to schedule another visit on August 31, 2006, the week prior to the administrative hearing. (R. 274).[5]

Declining to rely on the findings of Malloy's treating internist, and ignoring the consistent findings of Malloy's treating psychiatrist, the ALJ based his residual functional capacity determination primarily on the report of consultative psychologist, Dr. Dongiovanni who examined Malloy on one occasion in October 2005, nearly a year prior to the hearing. The ALJ reported his findings at some length:

> The claimant was disheveled in appearance and unshaven but was conversive, interacted well and was fully cooperative. The mental status examination indicated eye contact was good, there were no overt shifts of anxiety and he had a positive attitude. Mood was dysphoric and anxious and affective expression was slightly anxious

---

[5]Despite these record references to the need for and difficulty with obtaining a neurology consultation, the ALJ did not request one. A neurology evaluation should be ordered and evaluated prior to the hearing on remand.

16

> but within normal limits and emotional
> expression was appropriate to thought
> content and situation. Additionally,
> thought process was intact, thought
> continuity was goal-directed and relevant
> . . . Recent past memory, immediate
> retention and recall were intact. . . Dr.
> Dongiovanni [found] moderate limits in
> understanding, remembering and carrying
> out detailed instructions, making judgments
> on simple, work-related decisions,
> interacting appropriately with the general
> public, supervisors and co-workers and
> responding appropriately to work pressures
> in a usual work setting and changes in
> a routine setting.

(R. 17). DonGiovanni assigned Malloy a GAF of 60, reflecting

moderate symptoms in social and occupational functioning.

At the conclusion of this summary, the ALJ wrote: "The

consultative examination contained sufficient detail to enhance

its reliability and was performed by a mental health

professional." (R. 19). While this may be so, it does nothing to

explain why the ALJ devoted extended discussion to this report,

but ignored contrary, more recent, and repeated findings by

Malloy's treating psychiatrist. This is especially problematic

where Dr. Franchino's findings were consistent with those of

Malloy's other treating physician, Dr. Han, his examining

physician, Dr. Hirsch, and with Malloy's subjective complaints.

Although the ALJ is not expected "to make reference to every

relevant treatment note . . . we do expect the ALJ, as factfinder,

to consider and evaluate the medical evidence in the record

consistent with his responsibilities under the regulations and

17

case law." Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).
Here, the ALJ failed to discuss much of the relevant evidence
provided by Malloy's treating psychiatrist despite the rule that
opinions of a claimant's treating physician are entitled to
substantial weight. See 20 C.F.R. §§ 401.1527(d)(2),
416.927(d)(2). He also failed to account for *any* of the evidence
regarding Malloy's back impairment, although the regulations
direct that the Commissioner "analyze the cumulative side effects
of all of the claimant's impairments in determining whether [the
claimant] is capable of performing work and is not disabled."
Plumer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999)(citing 20 C.F.R.
§ 404.1523). The state of the record bearing on the impact of
Malloy's physical impairment suggests that the ALJ should have
ordered a physical residual functional capacity evaluation. This
evidence, too, should be ordered and evaluated as part of the
proceedings on remand.

     The Court of Appeals for the Third Circuit has stressed that
"the special nature of proceedings for disability benefits
dictates extra care on the part of the agency in developing an
administrative record and in explicitly weighing *all* evidence."
Doborwshy v. Califano, 606 F.2d 403, 406 (3d Cir. 1979)(emphasis
added). "Unless the [Commissioner] has analyzed all evidence and
has sufficiently explained the weight [he] has given to obviously
probative exhibits, to say that [the] decision is supported by
substantial evidence approaches an abdication of the court's 'duty

18

to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Gober v. Matthews , 574 F.2d 772, 776 (3d Cir. 1978)(quoting Arnold v. Secretary of HEW , 567 F.2d 258, 259 (4th Cir. 1977)). The ALJ's use of boilerplate language stating that he has given "careful consideration [to] the entire record" is insufficient to constitute adequate development of the administrative record. Greene , 2006 WL 1791264 at *6 n.8.

When the substance of the ALJ's opinion is distilled to its essence, it is apparent that the ALJ placed primary - if not total - reliance on the report of consultative psychologist, Dr. Dongiovanni. The court agrees with the claimant that it appears "that the ALJ included only those portions [of the record] which showed [Malloy] in a capable light and excluded those portions which showed him in a less-than capable light. . .[T]he ALJ did not build a logical bridge between the facts and his conclusions." (Doc. 9 at 13). This inadequate discussion of the evidence compromised the ALJ's analysis of the applicability of relevant listings at Step Three, the determination of Malloy's residual functional capacity[6] at Step Four, and the formulation of the

---

[6]The court has combed the record in vain for any medical evidence supporting the ALJ's determination that Malloy was able to perform light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The only medical evidence indicates that Malloy is unable to perform work at this level. (R. 284-85). In order for an ALJ to find that a claimant can perform the requirements of light work, there must be supporting medical evidence. Carter v. Apfel,

hypothetical questions posed to the vocational expert at Step Five. Since it is the function of the ALJ, not the court's, to evaluate the evidence, *see* Fargnoli , 247 F.3d at 42, remand is appropriate.

The claimant asks that in the event of remand the matter be assigned to a different ALJ. As a general matter, courts have held that whether a remanded case should be considered by different ALJ is a decision for the Commissioner. *See* Travis v. Sullivan , 985 F.2d 919, 924 (7th Cir. 1993) (discussing judicial reluctance to dictate procedures of administrative agencies). A court may, however, grant such a request where it appears that the impartiality of the ALJ is in question. Maniaci v. Apfel , 27 F. Supp. 2d 554, 559 (E.D. Pa. 1998)(citing Ventura v. Shalala , 55 F.3d 900, 904-05 (3d Cir.1995)(remanding to different ALJ after previous proceeding was not conducted impartially)). Based on the deficiencies noted in the opinion issued by the ALJ, the court is convinced that the Plaintiff's request is not without basis. Nonetheless, the indications of bias do not approach those described in Ventura. As a result, the court recommends that the ultimate decision as to assignment of an ALJ upon remand be made by the Commissioner after careful consideration of the deficiencies noted in the original decision.

---

200 F. Supp. 2d 393, 398 ( M.D. Pa. 2000)(citing Doak v, Heckler, 790 F.2d 26, 29 (3d Cir. 1986)).

### III. <u>CONCLUSION</u>

Because the Commissioner's disability determination is not supported by substantial evidence, it is recommended that the pending Motions for Summary Judgment (Docs. 8 and 10) be denied. It is also recommended that this matter be remanded to the Commissioner with instructions to proceed expeditiously to supplement the record as noted herein, hold a new hearing, and properly analyze the evidence of record.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, Objections to this Report and Recommendation are due by August 16, 2007. Any Response is due by August 27, 2007.

July 31, 2007

                                        /S/ Francis X. Caiazza
                                        Francis X. Caiazza
                                        U.S. Magistrate Judge

cc:
Counsel of Record
Via Electronic Mail

21